UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA<br><br>v.<br><br>JOEL ANDRADE, also known as "Wedo" | No. 18 CR 554<br><br>Judge Charles R. Norgle |

### GOVERNMENT'S SENTENCING MEMORANDUM

The UNITED STATES OF AMERICA, by its attorney, JOHN R. LAUSCH, JR., United States Attorney for the Northern District of Illinois, respectfully submits its sentencing memorandum and asks the Court to sentence defendant JOEL ANDRADE to a term of imprisonment of 188 months, which is at the bottom end of the recommended guidelines' range. As detailed below, such a sentence would be sufficient, but not greater than necessary, to punish ANDRADE for the offense of conviction, deter him from committing additional criminal conduct, and protect the public from further crime. In addition, the government requests that this Court impose a four-year term of supervised release that includes the conditions specified below.

**I.    Background**

    **A.    The Offense Conduct**

During the late morning hours of May 28, 2018, a cooperating law enforcement source ("CS-1") spoke with Individual B over the phone and asked whether Individual

1

B knew anyone who had heroin for sale and Individual B advised CS-1 that defendant had heroin for sale and told CS-1 to call defendant.

Later that same afternoon, defendant exchanged text messages, Snapchat messages and recorded calls with CS-1, who unbeknownst to defendant was cooperating with law enforcement. During these communications, defendant and CS-1 discussed having defendant selling 50 grams of heroin to CS-1.

In particular, at approximately 12:04 p.m., CS-1 engaged in the following recorded conversation with defendant:[1]

    ANDRADE: Yo.
    CS-1: What's up it's [CS-1's nickname]
    ANDRADE: Hello?
    CS-1: Yo yo what's up my nigga.
    ANDRADE: Oh what's good King.
    CS-1: This is the hotline the, the trap line.
    ANDRADE: Uh huh…
    CS-1: Hey umm you got some dog food [heroin]?
    ANDRADE: Yawww
    CS-1: Shit, what the grammies [grams of heroin] going for?
    ANDRADE: Damn king, I'm charging 80 a gram. It's rock [hard] [unintelligible] not even touched.
    CS-1: Damn. Even for motherfuckers that wanna grab like 50 [50 grams], it still be up there [$80 per gram].
    ANDRADE: Nah hell nah.
    CS-1: Did umm…fuck was I gonna say. I wanna check it out. Let me see what it look like. What color is it? Grey or…
    ANDRADE: It's kind of like…I gotta show you a picture…it's like brownish/beige. Light brown.
    CS-1: You can send me a Snap [Snapchat photo] of it too, shit… just so uhhh…so I can see before I do anything so I can tell this nigga what color it is woo woo woo. I used to grab my shit [heroin] from the uhhh Trumbulls [faction of the Latin King Street Gang] but uh they got some fucked up shit right now.
    ANDRADE: Oh, cool, cool, cool.
    CS-1: But shit send that so I can get that shit ready now.

---

[1] Law enforcements' interpretations of what was being stated is contained in brackets.

> ANDRADE: Alright, who you talking about this nigga fuckin umm…
> CS-1: No I was getting [unintelligible] my shorty 2-4.
> ANDRADE: No I gotchu King, give me a second dog. I'm right here at Tire [unintelligible] changing my tire, right quick. Can you give me a second and I'll show you.
> CS-1: Alright, bet, bet.

At approximately 12:54 p.m., defendant called CS-1 and told him he was going to send him a picture; however, the call got disconnected. Defendant then sent CS-1 a text message that read, "I sent you a picture"

At approximately 1:00 p.m. defendant called CS-1 and asked whether he got the picture. CS-1 responded, "You send that to my Snapchat?" and defendant responded, "Ohhh [unintelligible] Snapchat…I sent it to this phone. Look it. Check it out. I sent you two pictures, dog. I took different kinds, so I let you see both of them." CS-1 then instructed defendant to send the picture to CS-1 via Snapchat.

At approximately 1:17 p.m., CS-1 received a Snapchat message from defendant with two images of heroin.

On May 29, 2017, at approximately 11:40 a.m., CS-1 called defendant and had the following conversation:

> CS-1: What you on. You good [ready to sell heroin to CS-1]?
> ANDRADE: Yeah, why, what happened?
> CS-1: Yeah, still seeing if you was trying to do that [sell heroin to CS-1] today…uh, what I hollered at you about yesterday.
> ANDRADE: The 50 [50 grams of heroin]?
> CS-1: Yeah.
> ANDRADE: You for sure dog? Cause I'm not trying to bring it if you're not for sure. You know what I'm saying?
> CS-1: It's for sure my nigga. For sure.
> ANDRADE: So how you wanna do this?
> CS-1: I'm gonna go to Aurora and pick up my check. I should be back by like 3 something. 3 if you want to meet me by like uh Cicero.

> ANDRADE: Yeah yeah, just look it. Let me know when you're ready dog. So I could have that shit ready, you know?
> CS-1: Yeah, on the crown King, this ain't no bullshit. This weight bro, so this ain't shit to fuck around with.
> ANDRADE: Alright fasho my nigga.

At approximately 12:00 p.m., CS-1 spoke on the phone with defendant and asked for 100 grams of heroin, as opposed to the 50 grams initially discussed. Defendant told CS-1 that that would not be a problem and to let defendant know when CS-1 was ready.

At approximately 2:48 p.m., defendant spoke with CS-1 over the phone, and they agreed to meet in the area of Cicero and Cermak to conduct the heroin transaction.

At 4:14 p.m., CS-1 sent defendant a Snapchat message to confirm the price for the 100 grams, specifically, "Yo, 63 [$63 per gram] good? I got it already." Defendant responded, "Why u say tht." CS-1 then replied, "Waiting on u bro bro." Defendant wrote back, "Ok king got u I just left."

At about 4:47 p.m., CS-1 called defendant to see where he was at.

At approximately 5:22 p.m., defendant sent CS-1 a Snapchat message indicating that he was close by.

At approximately 5:30 p.m., Individual A began walking around the parking lot where CS-1 and defendant were going to meet, looking into vehicles and conducting counter-surveillance. About one minute later CS-1 called defendant and provided his location in the parking lot to defendant. CS-1 also told defendant that

4

CS-1 had seen Individual A, and defendant confirmed that Individual A was there with defendant.

At approximately 5:32 p.m., defendant pulled his vehicle into the parking lot where CS-1 was located and parked several spaces to the south of CS-1. CS-1 then got out of his car and walked up to defendant's car and got into the front passenger seat. Defendant was alone in the driver's seat. When CS-1 entered defendant's car, CS-1 gave $6,300 to defendant, and in return defendant provided 113.3 grams of heroin to CS-1 in a green tinted plastic bag. CS-1 then requested another package to wrap the heroin in and defendant subsequently provided to CS-1 a white USPS package to place the heroin into, which contained a label on the front that displayed defendant's name and address.

Defendant was followed away from the meet location by surveillance units and started to drive erratically through adjacent parking lots, making U-turns, stopping abruptly, and conducting what appeared to be counter-surveillance. Defendant eventually drove across the street to an adjacent parking lot and picked up Individual A before dropping Individual A off at a separate location and driving alone back to defendant's residence.

**II.     PSR, Guideline Calculations, and Mandatory Minimum**

The Probation Officer calculated defendant's offense level as follows:

```
24    Base Offense Level (USSG § 2D1.1(a)(5) and (c)(8))
34    Chapter Four Enhancement (USSG § 4B1.1(b)(2)
-3    Acceptance of responsibility (§§ 3E1.1(a) & (b))
31    Total offense level
```

PSR ¶¶ 12-22.

The government agrees with the offense level as calculated in the PSR and does not have any objections.

The PSR found that the defendant had eleven criminal history points and a criminal history category of V. PSR ¶¶ 25-39. However, defendant is a career offender; therefore, pursuant to USSG § 4B1.1(b), his criminal history category is VI. PSR ¶¶ 30, 36, 40. The government agrees with and has no objections to this calculation.

With an offense level of 31 and criminal history category of VI, defendant's advisory guidelines range is 188 to 235 months. PSR ¶ 88. The government agrees that this is the correct advisory guidelines range and does not have any objections.[2]

The minimum term of imprisonment is five years, pursuant to 18 U.S.C. §§ 841(a) and 841(b)(1)(B)(i). PSR ¶ 87.

### III. The Factors Set Forth in 18 U.S.C. § 3553(a) Warrant a Sentence of 188 Months

A review of the factors set forth in 18 U.S.C. § 3553(a) makes clear that a bottom guideline sentence of 188 months' imprisonment is appropriate here. Such a sentence is warranted by the history and characteristics of defendant; the seriousness of the offense and the need to promote respect for the law; to provide just punishment; and to afford adequate deterrence.

Defendant's criminal history started more than a decade ago, in 2006, when defendant was a 14 year old juvenile and adjudicated delinquent for the offenses of

---

[2] If defendant were not classified as a career offender under USSG § 4B1.1(b)(2), his guideline range would be 70 to 87 months imprisonment.

unlawful possession of a firearm and possession of a controlled substance. PSR ¶ 28. Defendant was adjudicated delinquent of one additional offense while a juvenile, for domestic battery, before moving on to the adult criminal system and being found guilty of manufacture/delivery 10 grams or more but less than 30 grams of cannabis in September of 2011, when he was a freshly minted 18 year old adult. PSR ¶¶ 29-30. Subsequently, between September of 2011 and his December of 2013, defendant was convicted and sentenced for four misdemeanors and two additional felonies, including possession of a controlled substance in May of 2011, and armed robbery in December of 2013, an offense for which defendant was sentenced to six years imprisonment and for which he was on parole at the time he committed the offense in the instant case. PSR ¶¶ 31-36, 38.

Defendant's prior sentences, including three sentences of imprisonment in the Illinois Department of Corrections, have done little to deter him from committing additional crimes. In the nearly 13 years since his first arrest, which resulted in adjudication or conviction, defendant has received opportunities to better his life and reform himself but he has failed to take advantage of those opportunities time and again. Instead, through his continued criminal conduct, defendant has continued to carelessly risk his freedom and his relationships with those close to him, in particular his wife and two minor age children, ages 9 and 6, and now finds himself before this court as a career offender under USSG § 4B1.1.

Notable for this court to consider are the circumstances of his previous convictions, in particular his armed robbery conviction, the events of which occurred

7

in December of 2013, and for which defendant was convicted and sentenced in June of 2016. PSR ¶ 36. In particular, according to a Chicago Police Department original case incident report, defendant was one of a group of subjects who struck the victim with a baseball bat, and attempted to duct tape and abduct the victim. Government Exhibit One, at p. 3. During these actions, the victim's cell phone and state I.D. were stolen and the victim suffered a fractured skull, bruising about the head and face, a swollen lip, and a chipped tooth. Government Exhibit One, at pp. 2-3.

What is also notable and should give this court great pause is defendant's consistent and repeated noncompliance while under various sentences of court supervision or parole, including defendant's actions in this case, which occurred while he was on parole for the previously referenced armed robbery conviction. Defendant's criminal history and alleged criminal conduct, detailed in the paragraphs 25-58 of the PSR, is indicative of a lack of respect for the law, lack of respect for the judicial system, and a lack of respect for the community around him, and demonstrate that his sale of 113 grams of herein on May 29, 2018, was not a one-off event. A sentence of 188 months imprisonment, which is at the low end of the career offender guideline range, will send a strong message to defendant, and other similarly situated individuals, that the threat posed by the illegal sale of heroin, in particular a sale conducted by someone with defendant's criminal history and which involved the sale of potentially hundreds of user level quantities, is a serious crime that will not be tolerated.

The government acknowledges that defendant has encountered significant challenges in his life. According to defendant, his childhood was turbulent and unstable, with both parents suffering from drug and alcohol addiction and being incapable of adequately providing for defendant and his siblings. PSR ¶ 60-62. As a result, at the age of seven, defendant and his siblings were placed into DCFS custody where defendant was raised in different group and foster homes, allegedly witnessing sexual assaults and violence and suffering physical abuse at the hands of his foster parents. PSR ¶ 62. Furthermore, after leaving DCFS custody, defendant was homeless for several years, and in April of 2017, he was shot in the spine and left paralyzed from the chest down. PSR ¶ 62, 70.

While these events are mitigating, they do not override the need to protect the public from defendant's criminal activities and deter him from committing additional crimes. While it may have been appropriate to show leniency earlier on in his criminal career, at the present time the severity and frequency of defendant's criminal history, the seriousness of this offense, and his high rate of recidivism justify and warrant a bottom guideline sentence of 188 months' imprisonment.

## IV. Supervised Release Conditions

The government requests that the Court impose a term of supervised release of four years. The government further requests that defendant be required to comply with the following mandatory conditions set forth in 18 U.S.C. § 3583(d) and USSG § 5D1.3(a):

- Not commit another federal, state or local offense.
- Not unlawfully possess a controlled substance.

- Cooperate with the collection of a DNA sample if the collection is authorized by law.

The government further recommends the following conditions because they serve to facilitate supervision by the probation officer, support defendant's rehabilitation and reintegration into the community, and promote deterrence and protect the public:

- Provide financial support to dependents if financially able.

- Refrain from knowingly meeting or communicating with any person, whom the defendant knows to be engaged, or planning to be engaged, in criminal activity, and not knowingly meet or communicate with the following persons: Latin Kings

- Refrain from possessing a firearm, destructive device, or dangerous weapon.

- Remain within the jurisdiction where defendant is being supervised, unless granted permission to leave by the court or a probation officer.

- Report to a probation officer as directed by the Court or a probation officer.

- Permit a probation officer to visit the defendant at any reasonable time at home, at work, at school, at a community service location, and other reasonable location specified by a probation officer, and permit confiscation of any contraband observed in plain view of the probation officer.

- Notify a probation officer promptly, within 72 hours, of any change in residence, employer, or workplace and, absent conditional or other legal privilege, answer inquiries by probation officer.

- Notify a probation officer promptly, within 72 hours, if arrested or questioned by a law enforcement officer.

In light of the ongoing need to support defendant's rehabilitation and reintegration into the community, protect the public, promote deterrence, and ensure that the probation officer can satisfy his or her duty to remain informed about the defendant, the government requests that the Court impose the following special

10

conditions of supervision. These conditions do not involve a deprivation of liberty greater than reasonably necessary to achieve the statutory goals of supervision:

- If you have not obtained a high school diploma or equivalent, you shall participate in a General Educational Development (GED) preparation course and seek to obtain a GED within the first year of supervision.

- Not enter into any agreement to act as an informer of a law enforcement agency without the permission of the court.

- Pay to the Clerk of the Court $6,300 as repayment to the United States of government funds you received during the investigation of this offense. The Clerk of the Court shall remit the funds to The Drug Enforcement Administration, c/o DEA Fiscal Cashier, 230 S. Dearborn Street #1200, Chicago, IL 60604.

**V.  Conclusion**

For the reasons set forth above, the government respectfully requests that the Court sentence defendant to a term of imprisonment of 188 months, which is at the low end of the sentencing guidelines, and the imposition of the proposed terms of supervised release.

> Respectfully submitted,
> JOHN R. LAUSCH, JR.
> United States Attorney
>
> By:  /s/ *Aaron R. Bond*
> AARON R. BOND
> Assistant United States Attorney
> 219 S. Dearborn Street, Fifth Floor
> Chicago, Illinois 60604
> (312) 353-5300

Dated: September 18, 2019